Good afternoon. May it please the court, Jonathan Libby appearing on behalf of Appellant Tarcisio Valencia-Barragan. I intend to reserve about a minute for rebuttal. Your honors, my intent today is to focus primarily on Mr. Valencia's suppression issue, but I would like to first briefly address the Rahaith issue, especially in light of the multiple 28J letters that the government has recently submitted. Rahaith is the second to the third and fourth prong of plain error review. We've made the argument that the error here was structural. The Fourth Circuit in Gary agrees with our position on that. Last week, the Fifth Circuit in Trujillo disagreed and came out the other way. Looking at both cases, they both essentially analyzed the identical Supreme Court precedents and simply came to different outcomes. We believe that the Fourth Circuit in Gary was correct, but obviously we'll leave that to this court's judgments. But assuming structural error is not the standard, the government has argued here that the conduct underlying Mr. Valencia's battery conviction, the elements of the California statutes, the sentence imposed, all show that Mr. Valencia couldn't have a prior misdemeanor domestic violence conviction, but that's just not true. There's a very good reason why he would not have known, and I apologize for not making this as clear in the brief as I could have. At the time of Mr. Valencia's state battery conviction in 2013, the law in the Ninth Circuit was that a conviction for battery based on offensive touching did not meet the misdemeanor crime of domestic violence for purposes of 922g. So at the time of his conviction, this did not qualify, and I would assume it wasn't until a year later that the Supreme Court in Castleman actually overruled, expressly abrogated the Ninth Circuit case, and the Ninth Circuit case, by the way, is United States v. Ellis, E-E-L-L-E-S-S, from 2003. So for a decade prior to Mr. Valencia's state battery conviction, the conviction didn't qualify. So he was not in a prohibited category, and it was a year later after he was convicted that the Supreme Court in Castleman reversed the Ninth Circuit. We can assume Mr. Valencia was not reading SCOTUS blog or following new developments in Supreme Court case law. So based on that, I think there is certainly evidence that suggests he would not know that he was in this prohibited category, and we believe that would certainly satisfy the third prong because there is in fact a But we're reviewing the motion to suppress here, so I feel like you're asking me to reach things that, you know, get there before we even deal with the specifics of if I look at your brief and what you're claiming. Well, of course, rehafe is one of our issues, Your Honor, so I did want to briefly address that. If the court doesn't have any questions on the rehafe issue, I do now want to turn to the suppression issue. And with respect to suppression, we believe it was errated not the motion to suppress based on the numerous Fourth Amendment violations that occurred here, starting with the initial car stop that was apparently based on an unverified anonymous tip, though the reason given was tinted windows. There was a prolongation of the stop. No, but would you say that? All right, that if you can't see in a vehicle, are you saying that that the officer could not legally have stopped him based on tinted windows that you can't see in or primarily that the detention extended beyond the time necessary to check the tinted windows? Well, we believe that under this court's decision in Caceres, that there was not, based on what the officer knew at the time, there was not sufficient evidence to initiate a traffic stop for tinted windows. That the tinted window statute in California is very complicated. There are many exceptions. There's a certain percentage of tinted windows. If you can't see in the car, they can stop him. Beg your pardon? You can't see through the tint if you can't see into the car. And isn't that the record before the court? Well, it's certainly the officer believed that this was an unlawfully tinted windows. That's certainly true. But then there was a prolongation of the stop. Okay, so she stopped him, indicated she was going to issue a fixed-ticket. That would have taken a matter of minutes. But your client claims that he doesn't understand English, so she had to call an interpreter. Well, she, in fact, is the one who called in the interpreter on her own. She offered the interpreter, yes. He was having difficulty understanding when she was saying a fixed-ticket, even in English. I've never heard the term fixed-ticket, so I would have not understood what she was talking about. But she was the one who said, would you like an interpreter? So she was the one who extended the stop to bring in the interpreter. He didn't ask for one. She said, well, I don't understand what you're saying. I mean, you would be making the opposite argument if you just issue someone a ticket and then they, and you sign it and you promise to appear or a fixed-ticket. I happen to know what a fixed-ticket is. You go get it fixed, you get it signed off, and you turn it in, and that's the end of it. Well, but of course, Your Honor, this went well beyond that. Well beyond that. She took him out of the car. She ends up conducting, she asked for consent to search the car. He says no. She conducts multiple dog sniffs. She frisks him. She then does a hand search herself. She finds nothing illegal in the vehicle and then says, okay, put him in handcuffs, and then is proceeding to arrest him. It's at that point. But didn't the district court concede all of those arguments that you're making? And the court said, let's start from the place that assuming all of these things were unlawful. It was an unlawful stop. It was an unlawful detention, and here we are with the attenuation doctrine, and that saves the day because your client fled, and now the police have his car, and they're searching him down, and they find the gun that ultimately supports this criminal charge. So that's really where it is. And that's what's wrong, Your Honor, because the circumstances. The court relied heavily on the Garcia case, the McClendon case. All of those certainly stand for that under the facts of those cases, there was a sufficiently intervening event that justified the later search. That there was an attenuation from the Fourth Amendment violations and the later search. So that's what happened here. Your client fled and abandoned his car on the highway. In all of those cases, there was never submission to police authority. Here, Mr. Valencia cooperated with the police for 40 minutes. He submitted to police authority from the beginning. But ultimately, at the critical moment, he did not submit to police authority. He ran, endangering himself and members of the public and the police who were pursuing him. Well, I don't believe that he did endanger anybody, but putting that aside for a moment, Your Honor, he fled having already submitted to police authority. And this is why we point to the D.C. Circuit case in Brody, which said. But why is that a significant factor when the question is really whether flight purges the taint of any illegality? Because this court has never said flight in and of itself does that. The government certainly is making that argument. When you read Garcia, what this court said was the flight in this case justified the later stop and search. But that's not what we're dealing with here. He, again, was dealing with a whole host of Fourth Amendment violations where he had, in fact, submitted to police authority, and then he ran. What about U.S. versus McClendon, where the flight essentially purged the taint from an unlawful search of a backpack? Which case, Your Honor? U.S. versus McClendon. McClendon. So, McClendon, there were, again, many additional facts. The court focused quite a bit in McClendon about the fact that the defendant had failed to submit to police authority at any point, right, and then took off and did, in fact, create a dangerous situation. The court spent pages in discussing how he refused to submit to police authority under Hodari D. So, that was a significant factor. Again, all of the cases that the government has cited... Well, but the court did say that the act of walking away from the police after the police made it clear that they were trying to arrest him was an intervening event that purged any taint that may have arisen from the illegal search of the backpack. That's right, but it was... That's why I think the question here is similar. They were trying to detain or arrest him. He fled. So, did that flight purge any taint from any illegal searches that may have occurred before he attempted to flee? Well, that's right. Whether there was a sufficiently intervening, independent event that would have permitted the later search. We submit that the mere fact that he ran does not do that. And for that, again, we rely on the D.C. Circuit decision in Brody, which says exactly that. That the mere fact that someone, after having submitted to police authority, takes off and runs would not be enough to justify a later search. Let me ask you this hypothetically. Am I free to evaluate the record before what the court has before it in terms of the district court that's in the record? Am I free to come to the conclusion that I believe that there was probable cause for the stop and that the detentions, that what happened thereafter, were not illegally prolonged and not even get to the taint issue? Am I free to do that? I believe you. I believe the court is. Yes, you're right. I mean, I realize you don't agree with that, but I'm just... Okay. Yes, I believe the court... Certainly, the court can affirm on any ground on which it believes affirmance is appropriate. Yes. And we, of course, have asked the court to evaluate all of the other Fourth Amendment issues. Okay. And there are no factual disputes that would warrant an evidentiary hearing or anything like that? Well, there were many factual disputes that would have warranted... Well, I mean, that's... I'm trying to understand your answer in response to Judge Callahan's question because you're saying we're free to not reach the issue of whether his flight is a sufficiently intervening event that then purged the taint, right? The issue here is that on the record before us, the district court went past all the illegal conduct to resolve the case on the flight issue alone. So if we were to say, well, we don't need to reach the flight issue. We'll just look at the question of probable cause. Are you saying that we'd have to remand for an evidentiary hearing because there are factual disputes? Or in response to Judge Callahan's question, are you saying, no, no, no, this court sitting here on appeal can actually reach those questions and rule as a matter of law on the record that's presently before us? I apologize, Your Honor. I was simply responding that the court, as a general matter, certainly has the authority to do what Judge Callahan was suggesting. I do not believe, however, that the evidentiary record is sufficient to do that in many ways. Obviously, we have a limited record here because the district court refused at the government's request to hold an evidentiary hearing. There are many things that the defendant indicated he disputed with respect to- But you didn't on appeal. You're not appealing the district court's failure to give you an evidentiary hearing. Well, because the court ruled that the evidentiary hearing was not relevant to its ultimate decision, which was just with respect to the attenuation doctrine. So that's all we were dealing with. But you could have made one of the issues. You could have. I read your brief. You could have said, we objected below and we think we should have had an evidentiary hearing. And we're appealing that. Your Honor, we didn't feel that was necessary because that was not the basis of the court's ruling. And even the government has conceded here that there are enough gaps in the record that should this court decide to reverse that it should remand at least for further factual findings and on a full evidentiary record because, yeah, it's a lot of these things are in fact unclear. All right. We've taken you over unless if any of the judges have additional questions, I want to give you that opportunity. All right. I'll give you one minute for rebuttal, even though we've gone over because we've asked you a lot of questions. All right. Let's move to the government. We can't hear. Microphone. The microphone is still off. Good afternoon, Your Honors, and may it please the court, Julia Reese for the United States. And I want to start first with Mr. Libby's suggestion that we have conceded that an evidentiary hearing is necessary. In fact, it said exactly the opposite. We've indicated that our belief is that on this record, this court could affirm the district court's ruling on the alternative ground that the stop was appropriate and there was no impermissible prolongation because there was reasonable suspicion by the time of the prolongation events that Mr. Libby has identified on appeal. Now, of course, the district court's decision here rested on attenuation. And so this court- No, we don't really have factual. We don't have factual findings by the district court on the probable cause arguments getting up to the run on the freeway. No, the district court did not make any factual findings relating to the merits of the underlying Fourth Amendment violations. However, the district court did indicate that it was relying on the facts that were set forth in the police report that Mr. Valencia attached to his motion to suppress. And those facts as set forth in the police report would be sufficient to affirm again on the alternative ground that there were no Fourth Amendment violations during the stop at all. Did the court just assume, let's just assume that there wasn't probable cause and jump right to the attenuation? Yes, that is what the district court did. So the court didn't find there was a probable cause, just jumped over? Correct. The district court ultimately, at least implicitly, found that there was probable cause based on any factors that were not tainted. But no, the district court did not find that there was probable cause for the search, or I think more relevant here, reasonable suspicion for the stop and for the duration during the stop itself. So no, there are no findings in that regard. Although, however, again, this court can affirm on any ground supported by the record. But the government believes that the easier, the more straightforward path to affirmance may be just to affirm on the ground that the district court did deny Mr. Valencia's suppression ruling. And that is that Mr. Valencia's headlong flight was a voluntary intervening event that attenuated the subsequent search that revealed the gun in the car from any antecedent illegalities during the traffic. Are you concerned that it might be an extension of the present cases that we have? I don't think that it would be, Your Honor. I believe that both Garcia and McClendon, I think that this case really follows directly from those. Garcia held initially that when you have that kind of headlong flight during an attempted traffic stop or during traffic stops at all, that that is flight that can attenuate any antecedent illegality. And McClendon took it further, and McClendon said that it doesn't matter if it's a car chase. Here, if you even have a defendant that just walks away when the police ask him to stop, that is enough. That constitutes flight that would be sufficient to purge any taint. And so I think that this is really between Garcia and McClendon at worst. It certainly is a more obvious flight from law enforcement than this court considered in McClendon, where again, the individual did nothing more than walk away from law enforcement officers when they asked him to stop. Here, you have a factual finding by the district court that Mr. Valencia's flight posed an extreme danger to himself and to other individuals on the road. And that factual finding is at ER 6. Now, given that particularly dangerous flight, which again, given that McClendon involved merely walking away, dangerousness isn't required before application of the attenuation doctrine. But here we do have dangerous flight. This court should defer to the factual findings made by the district court in that regard and find that this case is consistent even with Brody, which Brody, the government's position is that Brody limits attenuation to intervening circumstances involving intervening criminality or flight posing serious risks to public safety. And that limitation is just not consistent with this court's precedent in McClendon, which again, applied the attenuation doctrine to the mere act of walking away, taking a few steps away from the police officers when they asked you to stop. And so it's this application of the attenuation doctrine here is well, fits comfortably within this court's attenuation precedent. And I would say that what Mr. Valencia's criticisms of this conduct of the stop boil down to are they boil down to attacks on reasonable suspicion. Did Officer Jensen have cause to stop the car? And did she have cause to seek consent to conduct a dog snap and conduct the dog snap? And I would point this court's attention to Stripe, where the Supreme Court said that more than the mere absence of cause is required before a case would fall outside of the scope of the attenuation doctrine. And so I think reading Garcia and McClendon and Stripe, again, the attenuation doctrine clearly applies to the facts of this case. And unless the court has further questions on attenuation or the legality of the underlying stop, I can turn to the Raheith issue now. Yeah, I appear to have additional questions, so go ahead. So on the Raheith issue, Mr. Valencia has argued that that's structural error. And yes, Gary in the Fourth Circuit did find that the omission of the Raheith element from a plea call does constitute structural error. But as the government has noted, two circuits have already diverged from Gary explicitly. That's Hicks in the Fifth Circuit and Trujillo in the Tenth. And several other circuits have at least implicitly found that the omission of a Raheith element during a plea call does not constitute structural error. I will note that there's a petition for rehearing pending in Gary, and the Fourth Circuit has held its mandate pending resolution of that petition for rehearing. And frankly, the Fifth Circuit and the Tenth Circuit got it right when they rejected Gary's conclusion that structural error applies to the omission of elements during a plea call. This is just not an error that is in the narrow class of cases that would be considered structural, particularly given the strong presumption that even errors that implicate an individual's constitutional rights are not structural. So moving from there, Mr. Valencia bears the burden to demonstrate both prejudice, and there's a reasonable probability that he wouldn't have entered his guilty plea, and that allowing his conviction to stand would implicate the fairness, integrity, and reputation of the judicial proceedings. Mr. Valencia did not make any argument on the third prong in either his opening brief or his reply brief, and that failure to advance any argument whatsoever should be fatal to his Raheith claim. And frankly, Mr. Valencia couldn't demonstrate any prejudice or any reasonable probability that he wouldn't have pleaded guilty even if he tried. He hasn't indicated that he wouldn't have done so. He hasn't indicated that he wished to withdraw his guilty plea. And the facts underlying this conviction make quite clear that Mr. Valencia would have known that he was convicted of an offense that involved the use or attempted use of physical force against somebody with whom he had a domestic relationship. The conviction documents indicate that he willfully and unlawfully used force and violence against a parent of his child. As part of his sentence, he was ordered to participate in batterer's treatment. He was ordered to contribute to a domestic violence fund. And as Mr. Libby has indicated in his opening arguments, Castleman held offensive touching is enough to constitute a crime of domestic violence. And there's just no way for Mr. Valencia to have disputed that he knew that his offense involved offensive touching. If you look at the documents that the government has submitted, the judicially noticeable documents at page seven, it makes quite clear that Mr. Valencia pleaded guilty to offensive touching. Under those circumstances, there's just no way that Mr. Valencia could take the position that he wouldn't have pleaded guilty. And that's just based on the strength of the evidence that the government would have been able to submit a trial. And Mr. Valencia, as the government has pointed out, also received significant benefits by pleading guilty. He got credit for acceptance of responsibility. The government recommended a lower offense level consistent with the plea agreement than that that was called for under the PSR. And he received a time served sentence of just eight months imprisonment. Now given the substantial benefits that Mr. Valencia received and the strength of the government, the evidence that the government would have been able to present, Mr. Valencia can simply demonstrate no reasonable probability that he wouldn't have entered his guilty plea. And even if he could meet his burden under the third prong, this court should not exercise its discretion to notice the error in this case. Well, how much time did he face? Under the PSR, I believe I have to check your honor. If he had not gotten acceptance of responsibility, I believe the low end of the guidelines would have been around 18 months, but I would have to check. All right. Anything additional? No further questions, the government will submit on the briefs and urge the court to affirm. Okay, thank you. All right, you have one minute. Mr. Levy. Thank you, your honor. The government spent some time discussing the McClendon case and suggested that all Mr. McClendon did in that case was walk away from the police. That's not what happened. In McClendon, after refusing to comply with any police orders whatsoever, as police were approaching him, he moved his hands to his waistband, took a gun out of his waistband, flung it, and the cops later recovered the gun, which they said was still warm to the touch. Those were the facts. He didn't merely walk away. It was those additional facts that showed that there was this intervening event, the flinging of a gun that allowed the court to then take the gun. So McClendon is, again, not a case that stands for the proposition that flight on its own is enough. And with eight seconds, unless the court has additional questions, I'll submit. I don't think we do. Thank you both for your argument in this matter. This case will stand submitted. Court will be in recess until tomorrow at 1 p.m. Thank you both for your argument. This court for this session stands adjourned.
judges: Callahan, Nguyen, Kane